Bertold J. PEMBAUR, M.D., Plaintiff,

v.

CITY OF CINCINNATI, et al.,
Defendants.

No. C–1–81–412.

United States District Court,
S.D. Ohio, W.D.

Aug. 23, 1990.

448

Robert Manley, Cincinnati, Ohio, for plaintiff.

Roger Friedman, Jerry Luttenegger, Cincinnati, Ohio, for defendants.

## ORDER

CARL B. RUBIN, District Judge.

This matter is before the Court in accordance with a remand by the United States Court of Appeals for the Sixth Circuit (Doc. No. 99) and a hearing in open Court on February 28, 1990. The opinion of the United States Court of Appeals for the Sixth Circuit, 882 F.2d 1101, 1105 (6th Cir. 1989), contains the following language:

> Thus, we remand the case for further findings of fact as to the sources and amounts of the injuries to Pembaur's financial and emotional conditions.

The final sentence of the opinion advises:

> Accordingly, we ... REMAND for further factual findings regarding the na-

ture, extent, and causation of Pembaur's injuries.

*Id.* at 1107.

In accordance with the foregoing, the Court does submit herewith its Findings of Fact and Conclusions of Law.

## I.

## FINDINGS OF FACT

1. Plaintiff Bertold J. Pembaur, M.D. ("Pembaur") owned and operated the Rockdale Medical Center ("the Rockdale Center") located in Hamilton County, Ohio during and including, but not limited to the years 1976 through 1979. A significant portion of the Rockdale Center's practice was the medical treatment of Medicaid patients.

2. During the spring of 1977, a Grand Jury was convened in Hamilton County, Ohio for the purpose of investigating charges of fraudulent practices employed by plaintiff to obtain Medicaid payments from the State of Ohio.

3. Pursuant to the Grand Jury investigation, a search warrant was sought and obtained from a Judge of the Hamilton County Municipal Court for the Rockdale Center, authorizing in particular a search for medical, billing, employment, and payroll records maintained by the Rockdale Center. On April 26, 1977, law enforcement officers entered the Rockdale Center, searched the premises and seized a large number of such records. The seizure of the records and subsequent events surrounding the investigation and prosecution of Pembaur were matters of substantial public interest in Hamilton County and received publicity in the daily newspapers as well as on the local television channels.

4. Approximately 35,000 records were seized pursuant to the search warrant. All but some 550 of these records were returned to plaintiff within 10 to 14 days after the April 26, 1977 seizure.

5. To facilitate its investigation, the Grand Jury issued subpoenas directing two of Pembaur's employees from the Rockdale Center, Marjorie McKinley and Kevin Maldon, to appear before the Grand Jury to

testify. When the employees failed to appear as directed, two Judges of the Court of Common Pleas of Hamilton County issued, separately, capiases for their arrest and detention. The capiases stated that both parties had been lawfully served with subpoenas to appear before the Grand Jury and that each of them failed to appear. At no time has the validity of the capiases been challenged.

6. On May 19, 1977, two Hamilton County Deputy Sheriffs attempted to serve the capiases at Pembaur's clinic. Although the reception area is open to the public, the rest of the clinic may be entered only through a door next to the receptionist's window. Upon arriving, the Deputy Sheriffs identified themselves to the receptionist and sought to pass through this door, which was apparently open. The receptionist blocked their way and asked them to wait for the doctor. When Pembaur appeared a moment later, he and the receptionist closed the door, which automatically locked from the inside, and wedged a piece of wood between it and the wall. Returning to the receptionist's window, the Deputy Sheriffs identified themselves to Pembaur, showed him the capiases and explained why they were there. Pembaur refused to let them enter, claiming that the police had no legal authority to be there and requesting that they leave. He told them that he had called the Cincinnati police, the local media, and his lawyer. The Deputy Sheriffs decided not to take further action until the Cincinnati police arrived.

Shortly thereafter, several Cincinnati police officers appeared. The Deputy Sheriffs explained the situation to them and asked that they speak to Pembaur. The Cincinnati police told Pembaur that the papers were lawful and that he should allow the Deputy Sheriffs to enter. When Pembaur refused, the Cincinnati police called for a superior officer. When he too failed to persuade Pembaur to open the door, the Deputy Sheriffs decided to call their supervisor for further instructions. Their supervisor told them to call Assistant Prosecutor [William] Whalen and to follow his instructions. The Deputy Sheriffs then telephoned Whalen and informed him of the situation. Whalen conferred with County Prosecutor [Simon] Leis, who told Whalen to instruct the Deputy Sheriffs to "go in and get [the witnesses]." Whalen in turn passed these instructions along to the Deputy Sheriffs.

After a final attempt to persuade Pembaur voluntarily to allow them to enter, the Deputy Sheriffs tried unsuccessfully to force the door. City police officers, who had been advised of the County Prosecutor's instructions to "go in and get" the witnesses, obtained an axe and chopped down the door. The Deputy Sheriffs then entered and searched the clinic. Two individuals who fit [the] descriptions of the witnesses sought were detained, but turned out not to be the right persons.[1]

7. On June 24, 1977, the Grand Jury returned a six-count indictment against Pembaur, alleging violations of Ohio Revised Code §§ 2913.02, 2913.51, 2923.03, 2921.31, and 2921.32. The sixth count against Pembaur, charging plaintiff with violations of § 2921.31(A), was handed down because of his refusal to allow the Deputy Sheriffs to enter the Rockdale Center on May 19, 1977. That section, entitled "Obstruction of Official Business," provides as follows:

> (A) No person without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within his official capacity shall do any act which hampers or impedes a public official in the performance of his lawful duties.

The sixth count of the indictment was severed from the other five and tried first to a jury. On December 5, 1977, the jury returned its verdict, finding Pembaur guilty on this count. This conviction was ultimately upheld by the Ohio Supreme Court. *See State v. Pembaur*, 9 Ohio St.3d 136,

---

1. Finding of Fact 6 is taken verbatim from the opinion of the United States Supreme Court rendered pursuant to an appeal in this case. See *Pembaur v. Cincinnati*, 475 U.S. 469, 472, 106 S.Ct. 1292, 1294, 89 L.Ed.2d 452 (1986). Plaintiff testified at trial that this report of the events of May 19, 1977 comport with his recollection. Trial Transcript at 17, 4/29/87.

459 N.E.2d 217, *cert. denied,* 467 U.S. 1219, 104 S.Ct. 2668, 81 L.Ed.2d 373 (1984). In the Syllabus of the opinion, the Ohio Supreme Court stated: "Absent bad faith on the part of a law enforcement officer, an occupant of business premises cannot obstruct the officer in the discharge of his duty, whether or not the officer's actions are lawful under the circumstances." *Pembaur,* 9 Ohio St.3d at 136, 459 N.E.2d 217.

8. On December 10, 1979, Pembaur failed to appear before the Hamilton County Court of Common Pleas for trial of the remaining counts of the indictment and a warrant was thereby issued for his arrest. On December 11, 1979, plaintiff was indicted for failure to appear pursuant to Ohio Revised Code § 2937.29 which states in relevant part:

> When from all the circumstances the court is of the opinion that the accused will appear as required ... the accused may be released on his own recognizance. A failure to appear as required by such recognizance shall constitute an offense subject to the penalty provided in section 2937.99 of the Revised Code.

9. Plaintiff left the United States two days before his trial on the remaining counts of the indictment was to commence. En route to Austria, he traveled first to Canada. Pembaur was absent from the United States from December, 1979 to August, 1980. During that time, he traveled from the United States to Austria via Canada, returned to Canada, and then traveled back to Austria. He departed the United States without advising any agent of Hamilton County of his intention to do so. Pembaur asserts that the reason for his departure was to obtain medical treatment for a heart condition, but it has been conceded that permission for him to be absent from the United States while under indictment was never given by the Court of Common Pleas of Hamilton County.

10. Pembaur was the principal physician at the Rockdale Center. During his eight-month absence from the United States, two physicians attended his patients at the Rockdale Center.

11. Plaintiff returned to the United States on or around August 24th or 25th, 1980, a few days subsequent to the conviction of Mary Ruth McMahon, a nurse and assistant to Pembaur since 1960, who was found guilty of theft on charges brought against her in connection with the investigation of Pembaur and the Rockdale Center. On August 26, 1980, Pembaur presented himself to the Hamilton County Court of Common Pleas. From September 17, 1980 through October 7, 1980, Pembaur was tried and convicted for his failure to appear at trial in violation of Ohio Revised Code § 2937.29. Pembaur appealed this conviction, the Ohio Court of Appeals of Hamilton County reversed the conviction and remanded the case for a new trial which was held on February 14, 1984. Pembaur was acquitted of this charge on February 22, 1984.

12. Trial on the remaining five counts of the original indictment against Pembaur commenced on April 27, 1981. On June 8, 1981, count three was dismissed at the end of the prosecution's case. Also on this date, counts four and five of the indictment were nolled. On June 19, 1981, Pembaur was found not guilty of theft or of receiving stolen property.

13. In criminal trials alone Pembaur spent a total of sixty-four days in the courtroom over a period of seven years. Six days were required in 1977 for the trial on O.R.C. § 2921.31(A) which resulted in an ultimate conviction. Twenty days were required in 1980 and 1984 for two trials on O.R.C. § 2937.29—fourteen days on the original trial in 1980 in which Pembaur was convicted and, subsequent to the reversal of this conviction, six days in 1984 on a second trial which resulted in a acquittal. Thirty-eight days were required in 1981 for a trial on counts concerning violations of O.R.C. § 2913.02, 2913.51, 2923.03, 2921.31 and 2921.32. All counts in the 1981 trial resulted in either a dismissal, nolle or acquittal. In one instance on November 21, 1980, Pembaur was sentenced to the Ohio Penitentiary for a time period of one to five

years.[2]

14. Pembaur filed a civil complaint in the Court of Common Pleas of Hamilton County, Ohio on April 29, 1977, seeking injunctive relief and monetary damages for the seizure of records at the Rockdale Center on April 26, 1977. This action was dismissed by the Court of Common Pleas for want of prosecution. The Ohio Supreme Court affirmed the dismissal in *Pembaur v. Leis*, 1 Ohio St.3d 89, 437 N.E.2d 1199 (1982).

15. On April 20, 1981, plaintiff brought this action under 42 U.S.C. § 1983 alleging an unreasonable search of the premises of the Rockdale Center on May 19, 1977. Plaintiff alleged that his rights secured by the Fourth Amendment of the United States Constitution were violated by agents of Hamilton County, Ohio in connection with the search of the Rockdale Center on that day.

16. Pembaur's odyssey through the judicial system, several years in duration and commencing with the Grand Jury investigation in the spring of 1977, subjected the Rockdale Center and him to substantial publicity and exposure in the print and television media serving Hamilton County, Ohio. Pembaur initiated or cooperated in much of the news coverage surrounding (1) the events of the Grand Jury investigation, including the April 26, 1977 seizure of medical records and the May 19, 1977 search of the Rockdale Center, (2) Pembaur's indictment, (3) his flight from the jurisdiction of the Court of Common Pleas, and (4) his subsequent trials in the Court of Common Pleas of Hamilton County. Significant to this action, Pembaur himself called Channel 9, an affiliate of CBS, on May 19, 1977 and alerted them to the events transpiring at the Rockdale Center on that day. Channel 9 sent a cameraman to the premises and photographed the proceedings.

17. The Court takes judicial notice of the fact that *The Cincinnati Enquirer*, the principal daily newspaper serving Cincinnati and the surrounding areas, including Hamilton County, published fifteen separate articles in the year 1977 alone which related to or referred to the incident of May 19, 1977. From the spring of 1977 through 1979, the newspaper published approximately seventy stories reporting the criminal investigation and the subsequent litigation, both criminal and civil, involving Pembaur and the Rockdale Center.[3]

18. Plaintiff's expert witness, economist John F. Burke, Jr., testified at trial that the Rockdale Center earned gross revenues as follows:

| | |
|---|---|
| 1976 | $563,000.00 |
| 1977 | $421,000.00 |
| 1978 | $387,000.00 |
| 1979 | $384,372.00 |

Dr. Burke concluded that the Rockdale Center had a loss of $142,000.00 in 1977, $176,000.00 in 1978, and $179,000.00 in 1979. These losses of income have not been challenged by the defendant and are therefore deemed to be correct.

19. Pembaur rests his claim of loss of business solely on a decrease in yearly income from 1977 through 1979. No evidence, other than unsubstantiated assertions made by plaintiff, was offered which demonstrates what portion, if any, of the loss of income at the Rockdale Center was proximately caused by the incident of May 19, 1977. Plaintiff contends that his patient load decreased by almost 50% after the May 19, 1977 incident, although plaintiff has no recollection of any names of individuals who did not return to the Rockdale Center due to the search of the premises on that day.

20. Robert J. McDevitt, M.D., a psychiatrist called by plaintiff, testified that the emotional stress suffered by Pembaur had multiple causes:

---

**2.** Finding of Fact 13 was obtained from docket entries of the Hamilton County Court of Common Pleas submitted by counsel at the Court's request. See "Stipulation" Doc. No. 104.

**3.** Finding of Fact 17 resulted from an actual count of articles supplied on request of the Court by *The Cincinnati Enquirer*. It is significant only to demonstrate the widespread publicigy to which plaintiff's patients and potential patients were exposed.

452

McDevitt: "Well, Dr. Pembaur consulted me a long time ago, back as far as 1979. At that time I saw him and he was under considerable stress at that time because of a variety of things that had happened to him. Essentially he was upset because he had been—his records had been seized ..."

Manley: "Going back to the question of the history, what history did he give you?"

McDevitt: "The history was that he had been—his records had been seized in 1980—not '80, in April 26, 1977. There were three major incidents that he summarized. The first one was April 26, 1977 when 35,000 records were taken from his office. The second incident occurred on May 19, 1977 when his door was broken down ... Then the third issue that he felt was traumatic was being indicted or at least the indictment on June 24, 1977. At that time he was vacationing in Austria so it had no direct impact on him."

Deposition Transcript at 9–11, 4/23/87. Dr. McDevitt further testified upon cross-examination:

Friedmann: "And there were more stresses that occurred?"

McDevitt: "Yes.

Friedmann: "During the period of 1977 to 1980?"

McDevitt: "Yes."

Friedmann: "And Dr. Pembaur indicated to you that certain records had been taken from him April 26, 1977?"

McDevitt: "Yes."

Friedmann: "And his door had been taken May 19, 1987?"

McDevitt: "Yes."

Friedmann: "And did he tell you that he called the news media?"

McDevitt: "No news media."

Friedmann: "An attorney?"

McDevitt: "I think he was probably trying to call everybody in town."

Friedmann: "Did he indicate that he called Mr. Manley?"

McDevitt: "I'm sure he tried to reach him. He said he tried to reach every attorney."

Friedmann: "Did he relate that he had been indicted by the grand jury in 1977?"

McDevitt: "Yes."

Friedmann: "And that would be another stressful case?"

McDevitt: "Yes."

Friedmann: "And did he also indicate to you that his nurse and assistant, Ruth McMahon, had been indicted?"

McDevitt: "Yes."

Friedmann: "Did he relate to you that you [sic] he was tried for obstructing official business for blocking the door on May 19, 1977?"

McDevitt: "He mentioned that."

Friedmann: "And he related that he was convicted for that?"

McDevitt: "He did, yes. That's a stress also."

Friedmann: "That conviction could have carried a jail term?"

McDevitt: "Could have. That was part of the stress that he talked about."

Friedmann: "Did he also relate to you that his indictment for, [sic] medicaid fraud had been set for trial several times?"

McDevitt: "Yes."

Friedmann: "And that his nurse was tried for the medicaid fraud?"

McDevitt: "Yes."

Friedmann: "And he related to you obviously that he had fled the country."

McDevitt: "Yes."

Friedmann: "Would that be a stressful situation?"

McDevitt: "Well, I think it would be stressful in terms of his leaving behind the family. Of course, he was guaranteed good medical treatment, good medication and it was a place of refuge."

Friedmann: "But there would have been stress involved in leaving behind his family, home and business?"

McDevitt: "Yes. I'm just saying that breaking down the door was another straw that broke the camel's back."

Friedmann: "A straw or the straw?"

McDevitt: "It's up to other people to decide."

Friedmann: "It was a stressful situation?"

McDevitt: "Yes."

Friedmann: "As were many other situations?"

McDevitt: "Yes."

Deposition Transcript at 41–43, 4/23/87.

21. Pembaur corroborated Dr. McDevitt's testimony at trial:

Friedmann: "Do you recall the one time doing a so called stress test with Dr. McDevitt?"

Pembaur: "Yes."

Friedmann: "Where you list the certain events which could be stressful in your life?"

Pembaur: "Yes."

Friedmann: "And there were events occurring in your personal life unrelated to any of this litigation that was also stressful, weren't there?"

Pembaur: "Yes."

Friedmann: "And those events, I believe that your wife was very ill; isn't that correct?"

Pembaur: "That's correct."

Friedmann: "And you found it somewhat stressful that your one son was leaving home?"

Pembaur: "Well, to some degree, yes."

Friedmann: "You related that to Dr. McDevitt, didn't you?"

Pembaur: "Yes."

Friedmann: "And you also related to him the various indictments and trials that were going on with regard to your business practice; isn't that correct?"

Pembaur: "Yes, that's correct."

Trial Transcript at 57; 4/29/87.

22. Plaintiff offered no evidence which delimits the extent to which Pembaur's emotional stress was proximately caused by the incident of May 19, 1977 and not by the other stress-inducing events testified to by Pembaur and Dr. McDevitt.

II.

## OPINION

This Court confronts the formidable task of determining what, if any, damages claimed by plaintiff, both for his emotional stress and for his loss of income from the Rockdale Center, are attributable to the constitutional deprivation of Pembaur's Fourth Amendment rights triggered by the Hamilton County Deputy Sheriffs' entry and search of the Rockdale Center on May 19, 1977. The Findings of Fact already set forth are based on the testimony and evidence offered by the parties at a trial on damages in this action. Guided by the legal precedents discussed herein and informed by the evidence admitted at trial, this Court submits the following analysis in response to the directive of the Court of Appeals for the Sixth Circuit that entry of judgment be premised on a full discussion of the legal and factual bases for the damage award rendered.

The proper assessment of damages in this matter requires a consideration of three discrete categories: (A) The Events of April 26, 1977 and the Resulting Trials; (B) The Unauthorized Flight to a Foreign Country from December, 1979 to August, 1980; and (C) The Events of May 19, 1977 and the Resulting Trial.

(A) *The Events of April 26, 1977 and the Resulting Trials*

■ Based upon a search warrant issued by an appropriate judge, plaintiff's business premises were searched on April 26, 1977, and approximately 35,000 records were seized. Some 550 records were retained and the balance returned within fourteen days after that date. Plaintiff was indicted in June, 1977, on six counts charging him with: Theft under Ohio Revised Code § 2913.02; Receiving Stolen Property under Ohio Revised Code § 2913.51; Complicity under Ohio Revised Code § 2923.03; Obstructing Official Business under Ohio Revised Code § 2921.31; and Obstructing Justice under Ohio Revised Code § 2921.32. The obstruction of official business count was severed and is separately discussed hereafter.

Trial of the five counts began on April 27, 1981 and after thirty-eight days of trial plaintiff was acquitted of the offenses of theft and the offense of receiving stolen property. The other counts of the indictment were either dismissed or nolled. There can be no claim for damages arising out of this trial.

Plaintiff's business premises were searched as a result of a legal search warrant. He was indicted, arraigned, tried and acquitted. There is no doubt that an experience such as this would cause substantial emotional trauma and would undoubtedly cause financial loss. *See* Findings of Fact 3, 13, 17, 20 and 21. Dr. Pembaur was accused of being a thief and his patients and potential patients knew it. Whatever losses may have resulted from the workings of the criminal justice system, however, they are not compensable in the federal courts. Then Justice Rehnquist, speaking for the majority of the Supreme Court of the United States in *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), pointed out that § 1983 provides relief in the United States Courts only for those rights "secured by the Constitution and laws." *Id.* at 140, 99 S.Ct. at 2692. Then Justice Rehnquist went on to state that:

> Respondent's innocence of the charge contained in the warrant, while relevant to a tort claim of false imprisonment in most if not all jurisdictions, is largely irrelevant to his claim of deprivation of liberty without due process of law. The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted ... The Fourteenth Amendment does not protect against all deprivations of liberty, it protects only against deprivations of liberty accomplished "without due process of law."

*Id.* at 145, 99 S.Ct. at 2695.

The Court expresses no opinion as to whether plaintiff can maintain a cause of action under the state law of Ohio for damages resulting from the events of April 26, 1977 and the resulting trials. Pembaur

elected, however, to bring this matter into the United States District Court and *Baker v. McCollan* applies. Plaintiff is barred from recovering any damages flowing from these events.

(B) *The Unauthorized Flight to a Foreign Country from December, 1979 to August, 1980*

■ In December, 1979, plaintiff elected to flee the United States without authorization from the Common Pleas Court where the remaining five counts of the indictment were pending. He was subsequently indicted for failure to appear in accordance with Ohio Revised Code § 2937.29. Plaintiff remained absent from the jurisdiction for approximately eight months—until August, 1980. This was a voluntary act of plaintiff and for whatever reasons he may have found to justify his flight, Pembaur is in no position to assert damages thereby, either emotional or otherwise. The Court notes in passing that plaintiff does not seek financial damages for any period beyond December, 1979. The claim for emotional damages is not so limited. It cannot be said that his decision to leave his practice, his family and his home was accomplished *without stress or emotional distress.* In this connection, the testimony of plaintiff's expert, Dr. Robert McDevitt, a psychiatrist, is worthy of review. Upon cross-examination by Assistant County Prosecutor Friedmann the following occurred:

> Friedmann: And he related to you obviously that he had fled the country?
>
> McDevitt: Yes.
>
> Friedmann: Would that be a stressful situation?
>
> McDevitt: Well I think it would be stressful in terms of his leaving behind the family. Of course, he was guaranteed good medical treatment, good medication, and *it was a place of refuge.* (emphasis added).

Finding of Fact 20. One is tempted to ask, "Refuge from what? From an indictment properly drawn, set for trial before an appropriate court and with a prospect of incarceration?" Plaintiff may not recover for any emotional stress he suffered due to

his unauthorized flight from the United States while under indictment.

### (C) The Events of May 19, 1977 and the Resulting Trial

■ It is damages flowing from the events of that day which form the sole basis of plaintiff's claim in this case. A door on the private property of plaintiff was broken down by Hamilton County officials and it was subsequently determined that his constitutional rights thereby were violated. Were that the totality of the events causing emotional and financial harm, the Court would have no difficulty in assessing appropriate damages. The reality, however, is far different.

Plaintiff cannot escape the evidence in the record which establishes that from the spring of 1977 through February, 1984, plaintiff endured two indictments containing seven separate counts, four criminal trials lasting a total of sixty-four days, two of which resulted in convictions by the juries, and an imposition of a sentence carrying a jail term of one to five years. By lumping together all claims for emotional stress and financial loss, able counsel for the plaintiff has sought to avoid the strictures of *Baker v. McCollan*. However, there is no entitlement to damages caused by the events of April 26, 1977 and the resulting trials. There is no entitlement to damages caused by Pembaur's flight to a foreign country. What plaintiff may recover for is those damages proved by a preponderance of the evidence which were caused by the search of the Rockdale Center on May 19, 1977.

### Damages Under 42 U.S.C. § 1983

■ Section 1983 creates a "species of tort liability" for persons denied those rights, privileges or immunities secured by the United States Constitution. *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 305, 106 S.Ct. 2537, 2541–42, 91 L.Ed.2d 249 (1986) *citing Carey v. Piphus*, 435 U.S. 247, 253, 98 S.Ct. 1042, 1046–47, 55 L.Ed.2d 252 (1978). The inquiry into what damages flow from a constitutional deprivation requires that the Court look to the common law for an analogue which most closely parallels the particular interests protected by the Constitution and violated by the defendant. *Stachura*, 477 U.S. at 306, 106 S.Ct. at 2542–43. By adapting common law tort damages rules to the constitutional deprivation complained of, § 1983 damage awards become legally and analytically grounded and plaintiffs are afforded compensation for actual injuries suffered. *See Stachura*, 477 U.S. at 307, 310, 106 S.Ct. at 2543, 2544 (damages based on an abstract value of a constitutional right would be too uncertain and would inject caprice into the determination of § 1983 damage awards); *see also Carey*, 435 U.S. at 254, 255, 98 S.Ct. at 1047–48.

■ Compensatory damages—"damages grounded in determinations of plaintiffs' actual losses"—are the mechanism by which constitutional deprivations are redressed. *Stachura*, 477 U.S. at 307, 106 S.Ct. at 2543. Compensatory damages may include out-of-pocket losses, other monetary harms, impairment of reputation, and mental anguish or suffering. *Id.* Presumed damages, traditionally part of the range of tort law remedies, may be substituted for ordinary compensatory damages when the injury is likely to have occurred but is difficult to establish. *Id.* at 310–11, 106 S.Ct. at 2544–45. The damage rules of the common law tort analogue employed in a particular § 1983 case will dictate whether compensatory or presumed damages are recoverable for the constitutional deprivation suffered. *See Parrish v. Johnson*, 800 F.2d 600, 610 (6th Cir.1986) *citing Carey*, 435 U.S. at 264–65, 98 S.Ct. at 1052–53.

■ In this action, Pembaur was deprived his rights secured by the Fourth Amendment when the Hamilton County Deputy Sheriffs forcibly entered and searched the Rockdale Center on May 19, 1977. The privacy interests implicated by the Fourth Amendment guarantees have several analogues at common law. *See Halperin v. Kissinger*, 606 F.2d 1192, 1199 (D.C.Cir.1979), *aff'd in part, cert. dism'd*, 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981) (unreasonable electronic surveillance interferes with an individual's privacy

**456**

rights, triggering Fourth Amendment violations); *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 394, 91 S.Ct. 1999, 2003–04, 29 L.Ed.2d 619 (1971) (comparing Fourth Amendment violations with the torts of trespass and invasion of privacy); *Herrera v. Valentine,* 653 F.2d 1220, 1229–31 (6th Cir.1981) (violations of the rights secured by the Due Process Clause, the Fourth and Fifth Amendments most analogous to interests protected by the common law dignity torts). The unlawful entry of the Hamilton County Deputy Sheriffs onto the premises of the Rockdale Center most closely parallels the tortious conduct of trespass. The damage rules employed by Ohio courts in actions for trespass should therefore be applied.

*Damages for Trespass*

■ Ohio law mirrors the Restatement of the Law, Torts, 2d, § 158 which defines trespass as:

"[O]ne is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally

'(a) enters land in the possession of the other * * *.' "

*Allstate Fire Ins. Co. v. Singler,* 14 Ohio St.2d 27, 236 N.E.2d 79, 80 (1968). A plaintiff who has proven that the defendant's conduct amounted to trespass is entitled to recover the amount of the actual damages suffered, if any. *Holeton v. Ellison,* 64 Ohio L.Abs. 214, 111 N.E.2d 399 (1952). A plaintiff seeking compensatory damages for a trespass must "prove that the trespass proximately caused the harm for which compensation is sought and [is required] to prove the amount of the damage." *Allstate,* 236 N.E.2d at 81 *citing* 1 Restatement of the Law, Torts, § 163; 1 Harper & James, Torts, § 1.8. Proximate cause is generally defined as a natural and continuous sequence that contributes to produce the result, and without which the result could not have happened. *First National Bank v. Cann,* 503 F.Supp. 419, 439 (N.D.Ohio 1980), *aff'd,* 669 F.2d 415 (6th Cir.1982). If the injury cited would have occurred without the tortious conduct complained of, proximate cause has not been established. *Id.*

■ The Ohio courts recognize that every unauthorized entry upon the land of another constitutes a trespass and regardless of whether the owner suffered substantial injury or not, he at least sustains a legal injury which entitles the owner to a verdict for some damages. *Pearl v. Pic Walsh Freight Co.,* 112 Ohio App. 11, 168 N.E.2d 571, 573 (1960). The law of Ohio conclusively presumes damages in every case of trespass. *Id.* 168 N.E.2d at 572.

To ascertain what, if any damages, Pembaur is entitled to for the Fourth Amendment violation occurring on May 19, 1977, these damage rules must be applied. The injuries complained of are (1) emotional injury, and (2) loss of business at the Rockdale Center.

1. *Emotional Injury*

■ While the emotional consequences of acts of trespassers are compensable under Ohio law, *Baker v. Shymkiv,* 6 Ohio St.3d 151, 451 N.E.2d 811 (1983); 30 O.Jur.3d, Damages § 82, plaintiff must first demonstrate that the incident of May 19, 1977 was the proximate cause of the stress he suffered. To that end, plaintiff must prove that without the Fourth Amendment violation, the stress he seeks to recover for would not have occurred. The evidence in this case is to the contrary. Pembaur admits and Dr. McDevitt corroborates that Pembaur's stress had several sources including *inter alia* the seizure of his medical records on April 26, 1977, his indictment for Medicaid fraud and obstruction of justice on June 24, 1977, his criminal trials and his conviction on one count of the indictment as well as family problems. Findings of Fact 20, 21, 22.

It is simply not enough for a plaintiff to point a finger at a defendant and claim that emotional injuries likely resulting from other sources were in fact caused by the defendant's tortious conduct. This would contradict the dictates of the *Stachura* Court requiring that § 1983 damages comport with the compensable principle. While

not denying the constitutional deprivation suffered by Pembaur, this Court is bound by the fundamental principles of tort law which mandate that plaintiff meet his burden of proof as to causation. The damages sought must have resulted from the Fourth Amendment violation to ensure that Hamilton County is not held liable for injuries unrelated to its conduct. Plaintiff has made no attempts to produce evidence which demonstrates what portion of the stress complained of is directly attributable to the May 19, 1977 incident. Without such proof, the Court engages in speculation and caprice as to what compensable damages, if any, are owing from Hamilton County. This would be both unfair and insupportable. No compensatory damages are due plaintiff on his claim of emotional stress.

### 2. *Loss of Business*

▉ It is uncontested that plaintiff had a reduced income from 1977 through 1979 in the amount of $497,000. At the outset, the Court determines that no business loss of income after this point is compensable since Pembaur, having left the United States from December, 1979 to August, 1980, in effect abandoned his patients without warning and effectively cut himself off from his practice at the Rockdale Center and the income generated by it. Finding of Fact 9. The decline in gross revenues at the Rockdale Center from 1977 through 1979 is undisputed. What remains in doubt, however, is what portion, if any, of the loss was proximately caused by the constitutional deprivation of Pembaur's Fourth Amendment rights on May 19, 1977.

▉ From the Grand Jury investigation commencing in the spring of 1977 to December, 1979 when Pembaur fled this jurisdiction, the record is replete with events which could have—and likely did—adversely impact Pembaur's medical practice. Findings of Fact 2, 3, 4, 5, 6, 7, 8, 13, 16. The controversy surrounding the Rockdale Center drew substantial public attention and was covered extensively by the local media, ensuring that a significant percentage of Hamilton County residents were aware of the criminal investigation of plain-

tiff. Findings of Fact 3, 17. Moreover, the publicity attendant to the incident of May 19, 1977 was instigated by Pembaur himself. Finding of Fact 16.

Again, the Court is restrained by the principles of common law from calculating, absent the benefit of evidence, what amount of the loss in revenues was proximately caused by the Fourth Amendment violation. Plaintiff insists that the losses flow directly from the incident of May 19, 1977 but he fails to substantiate his claim with evidence such as statistical analysis, a survey, or testimony of former patients. The burden of proof rests squarely on the plaintiff in this regard. Without demonstrating that the constitutional deprivation proximately caused the loss of revenue claimed, plaintiff has not proven compensable damages.

### 3. *Presumed Damages*

▉ Damages to plaintiff for the violation of his constitutional rights may be presumed—a remedy which is both compensatory in nature and available under the tort law of Ohio. *See Stachura,* 477 U.S. at 310, 106 S.Ct. at 2544–45; *Pearl,* 168 N.E.2d 572. Presumed damages are a substitute for compensatory damages and are appropriate when a plaintiff seeks compensation for an injury that is likely to have occurred by is difficult to establish. *Stachura,* 477 U.S. at 310–311, 106 S.Ct. at 2544–45. Presumed damages consist of a rough approximation of the harm which plaintiff likely suffered. *Id.* Damages for the vindication of a person's constitutional rights have ranged from $2,500 awarded in *Smith·v. Dooley,* 591 F.Supp. 1157 (W.D. La.1984), *aff'd,* 778 F.2d 788 (5th Cir.1985), to $5,000 awarded in *Walje v. City of Winchester, Ky.,* 827 F.2d 10 (6th Cir.1987) and in *City of Watseka v. Illinois Public Action Council,* 796 F.2d 1547 (7th Cir.1986), *aff'd,* 479 U.S. 1048, 107 S.Ct. 919, 93 L.Ed.2d 972 (1987).

▉ Based upon the evidence before this Court, the Court does hereby award presumed damages to plaintiff in the sum of Five Thousand Dollars ($5,000.00) for the violation of his Fourth Amendment rights on May 19, 1977. The Court does

note that such an award creates the anomalous situation whereby a person may be convicted in the Ohio State Court and compensated in the United States District Court for essentially the same conduct.

## III.

### CONCLUSIONS OF LAW

A. Pursuant to an Order of Remand by the United States Court of Appeals for the Sixth Circuit, this Court has jurisdiction to issue further Findings of Fact as to the nature, extent and causation of plaintiff's injuries. *Pembaur v. City of Cincinnati*, 882 F.2d 1101 (6th Cir.1989).

B. On April 26, 1977, agents of Hamilton County, Ohio, with a lawful search warrant removed records from the Rockdale Center. Plaintiff was indicted, tried and acquitted of any offense arising out of that day's events. He is not entitled to any damages, either financial or emotional arising out of these events in the United States District Court. *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).

C. From December, 1979, to August, 1980, Plaintiff voluntarily fled the jurisdiction of the Hamilton County Common Pleas Court. He remained in a foreign country during that period of time. No emotional damages may be claimed for this voluntary act.

D. On May 19, 1977, agents of Hamilton County, Ohio conducted an unreasonable search of the Rockdale Center in violation of plaintiff's Fourth Amendment rights secured by the United States Constitution.

E. Plaintiff's action brought under 42 U.S.C. § 1983 charges defendant with a Fourth Amendment violation analogous to the common law tort of trespass. Damages flowing from the constitutional deprivation must be analyzed according to the principles of common law applied by Ohio courts to redress this type of tortious conduct. *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986); *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).

F. To recover compensatory damages under the law of Ohio, plaintiff is required to prove (1) that the trespass proximately caused the harm for which compensation is sought and (2) what amount of damage is attributable to the trespass. *Allstate Fire Ins. Co. v. Singler*, 14 Ohio St.2d 27, 236 N.E.2d 79 (1968).

G. Plaintiff's evidence failed to prove that the emotional stress complained of was proximately caused by the constitutional deprivation suffered on May 19, 1977.

H. Plaintiff's evidence failed to prove that the loss in business at the Rockdale Center from 1977 through 1979 was proximately caused by the Fourth Amendment violation on May 19, 1977.

I. Plaintiff is entitled to presumed damages for the harm suffered by defendant's violation of his Fourth Amendment rights on May 19, 1977. *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986); *Pearl v. Pic Walsh Freight Co.*, 112 Ohio App. 11, 168 N.E.2d 571 (1960).

J. In accordance with the foregoing, plaintiff is awarded presumed damages against defendant Hamilton County, Ohio in the sum of Five Thousand Dollars ($5,000.00) and those costs expended herein.

IT IS SO ORDERED.