CROWN PROPERTY DEVELOPMENT, INC., Appellant and Cross–Appellee,

v.

OMEGA OIL COMPANY, Appellee and Cross–Appellant.

[Cite as *Crown Property Dev., Inc. v. Omega Oil Co.* (1996), 113 Ohio App.3d 647.]

Court of Appeals of Ohio,
Twelfth District, Fayette County.

No. CA96–01–002.

Decided Aug. 26, 1996.

648

*Feinstein & Mulligan* and *Jeffrey D. Swick*, for appellant and cross-appellee.

*Coolidge, Wall, Womsley & Lombard Co., L.P.A.,* and *John A. Cumming,* for appellee and cross-appellant.

---

WILLIAM W. YOUNG, Judge.

Plaintiff-appellant, Crown Property Development, Inc., appeals an order of the Fayette County Court of Common Pleas dismissing appellant's breach of contract action against defendant-appellee, Omega Oil Company.

Appellant is an Ohio corporation formed in July 1990. Appellant's shareholders, directors and officers include Robert Bagshaw and Donald L. Feinstein. Feinstein is also appellant's president and an attorney. Appellee is a Delaware

corporation with its principal place of business in Dayton, Ohio. Appellee is a wholly owned subsidiary of Amoco Oil Company ("Amoco"). Bill Wilcox was appellee's president until John Cooper Agent took Wilcox's position on October 1, 1990.

On June 2, 1989, Bagshaw and Feinstein entered into a real estate purchase contract with appellee to buy a tract of approximately five acres of land in Jefferson Township, Fayette County, Ohio (the "property"). The contract states in relevant part that the contract "shall be performed and this transaction closed within 30 days after contingencies are met or released unless the parties agree in writing to an extension." Exhibit C, which was attached to and incorporated in the contract by reference, states:

"[The undersigned Buyer agrees to buy, and the undersigned Seller agrees to sell on the following terms:]

"* * *

"B. Contingent upon Buyer acquiring financing acceptable to Buyer within ninety (90) days after acceptance of this offer.

"C. Buyer has right to assign this contract to any partnership or corporation of which Buyer is a party.

"D. Seller to remove any buried tanks from Omega Station and provide certificates from an engineering company showing that samples taken from the ground surrounding the tanks or the prior tank locations comply with current E.P.A. regulations."

A first amendment to the contract (dated August 29, 1989) and a second amendment (dated October 25, 1989) extended the contract's financing contingency to November 1, 1989 and May 1, 1990, respectively. Sometime prior to November 8, 1989, and following the removal of the buried tanks, it was discovered that the property had been contaminated by leaking tanks. On April 27, 1990, Wilcox wrote a letter to Feinstein which states:

"As you know, we have discovered significant environmental contamination on this site. The Ohio Bureau of Underground Storage Regulation is working with us and has approved an interim remediation plan involving on site pumping wells which will be totally underground and connected by underground piping to a location on our adjoining site. The water will then be monitored and placed into the public sewer system. We are also doing further soil borings and will remove contaminated soil and treat it as necessary.

"* * *

"We understand your concern regarding how prospective lenders or buyers might view this property due to the ongoing remediation. However, there is

simply nothing we can do to eliminate the need for the ongoing remediation. If this is unacceptable to you, you may withdraw from the contract."

Thereafter, on May 1, 1990, the parties entered into a third amendment to the contract. The third amendment not only extended the financing contingency to October 12, 1990, it also deleted paragraph D of Exhibit C of the contract and replaced it with the following provision:

"Seller has removed all buried tanks from the closed Omega station on the property and shall comply with the interim and final remediation plans approved by the Ohio Bureau of Underground Storage Tank Regulation ('BUSTR'). Further, Seller agrees to comply with any and all requirements of BUSTR or any other governmental environmental regulatory body regarding environmental contamination on the property or which has originated on the property. Seller agrees to indemnify and hold Buyer harmless from any and all claims, losses or damages resulting from any environmental contamination related to this site created prior to sale of the property to Buyer. Buyer understands that the remediation process will be ongoing and agrees to provide necessary easements to permit Seller to monitor the property and perform necessary remediation. Seller agrees to perform such inspections and remediation work in as unobtrusive a manner as possible at Seller's sole expense. Seller agrees to work with lenders on a best effort basis to explain the existing environmental contamination and remediation efforts at Buyer's request."

The third amendment further states that "[i]n the event Buyer is not satisfied with the environmental remediation on site or off site, Buyer shall have a right to terminate this contract and have all earnest money returned to him."

Feinstein testified in his deposition that around the third or fourth amendment, he clearly indicated to Agent that financing the purchase of the property was not a problem. A fourth amendment, dated October 10, 1990, extended the financing contingency to June 1, 1991 and assigned the contract to appellant with the approval of appellee. Feinstein testified that the financing contingency was extended to extend the definite term of the contract until the environmental problem was resolved. Feinstein testified that appellant "did not have enough of a handle on the EPA problem to go forward" and that the extension of the financing contingency was a way to protect appellant. The fourth amendment also added the following two provisions to Exhibit C:

"[1(G) ] Seller has removed contaminated soil from the underground fuel tank cavities on its newly remodeled Omega station on the adjoining southeast corner of the 5.50 acre parcel and placed it on part of the 5.50 acre site directly north of the remodeled Omega site ('Soil Storage Area'). * * * Seller shall have the right to reserve an easement in its deed or by separate instrument over the Soil Storage Area to store and treat the contaminated soil in compliance with the

interim and final remediation plans approved by the Ohio Bureau of Underground Storage Tank Regulation ('BUSTR'). Further, Seller agrees to comply with any and all requirements of BUSTR or any other governmental environmental regulatory body regarding environmental contamination caused by the contaminated soils. Seller agrees to indemnify and hold Buyer harmless from any and all claims, losses or damages resulting from any environmental contamination related to these contaminated soils. Buyer understands that the remediation process will be ongoing and agrees to provide necessary easements to permit Seller to monitor the property and perform necessary remediation, including installation of such machinery as it deems necessary along with accompanying power lines and ingress and egress. Seller agrees to perform such inspections and remediation work in an unobtrusive a manner as possible at Seller's sole expense. Seller agrees to work with lenders on a best effort basis to explain the existing environmental contamination and remediation efforts at Buyer's request.

"[1(H)] The easements described above in 1(D) shall include all rights reasonably needed to accomplish the purposes described in 1(D), including any needed maintenance, repairs or replacement to the underground plumbing, pumps or other installations in the easement area. * * * The easements shall prohibit the construction of permanent structures other than parking, driveways, landscaped areas or other uses approved in advance by Seller in the easement area. In no case shall Seller be responsible for any lost profits or consequential damages resulting from Seller exercising its rights under the easements."

On May 24, 1991, Feinstein, Agent, and other representatives of both parties met at the property. At the meeting, Feinstein told Agent that appellant was willing, ready and able to buy the property but that appellant requested an extension of the financing contingency to protect appellant since Feinstein "still did not have a handle on the entire scope of the EPA problem." Feinstein testified that he had always viewed the remediation of the contamination and the financing contingency as two contingencies that had to be met before the parties could close. As a result, at the May 24, 1991 meeting, Feinstein asked Agent to consider an amendment to the contract which would remove the financing contingency from the contract but which would condition the closing on appellee receiving a "no further action" approval from the state of Ohio. Agent left the meeting stating he would think about Feinstein's request.

Agent testified in his deposition that he advised Feinstein at the meeting that appellee was ready to sell the property then and that it would continue to remedy the property "for however long it takes." Agent testified appellee did not want to sell the property a few years down the road when remediation would be completed "at today's price." The meeting was concluded by the signing of the fifth amendment which extended the financing contingency to September 1, 1991.

Feinstein testified that before September 1, 1991, he asked Agent for an extension of the financing contingency beyond September 1, 1991. Agent refused to grant a new extension. Feinstein testified that Agent suggested instead to give appellant a right of first refusal. Agent testified that he eventually told Feinstein that appellee would not give appellant a right of first refusal.

By letter dated July 29, 1991, Agent reminded Feinstein that "the contract * * * will expire on September 1, 1991, unless you have given us notice that the financing contingency has been met or that you forgive the financing contingency." Feinstein testified that he never received the letter. Appellant never asked for a closing. The parties never closed on the property. ·

On February 26, 1992, appellee sold a portion of the property to the Fayette County Board of Commissioners for an access road. By letter dated January 31, 1992, appellant demanded that appellee meet its obligations under the parties' contract. The letter states that "[a]ll contingencies for closing on the purchase have been met or released with the exception of Omega's obligation to 'comply with the interim and final remediation plans approved by the Ohio Bureau of Underground Storage Tanks ("BUSTR").' "

On March 23, 1992, appellant filed a complaint in the trial court against appellee alleging breach of contract, fraud, negligent misrepresentation, trespass, public nuisance,[1] and negligence in the transportation and storage of petroleum products. On April 26, 1993, appellee filed a motion for summary judgment. Appellant filed its memorandum opposing summary judgment on May 12, 1993.

By judgment entry filed October 7, 1994, the trial court granted summary judgment in favor of appellee with regard to appellant's claims of breach of contract, fraud, and negligent misrepresentation. The trial court, however, denied appellee's motion for summary judgment with regard to appellant's claims of trespass, public nuisance, and negligence in the transportation and storage of petroleum products. On November 14, 1995, (or more than thirteen months after the trial court's judgment entry), appellee filed a motion to dismiss for failure to prosecute in violation of Civ.R. 41(B)(1) and Fayette C.P.Loc.R. 16. By judgment entry filed December 19, 1995, the trial court granted appellee's motion and dismissed the case.

Appellant timely filed this appeal and raises two assignments of error. Appellee cross-appealed and raises one assignment of error. Under its first assign-

---

1. With regard to trespass, appellant alleges in its complaint that appellee has "caused or permitted the uninvited * * * spillage and/or migration of * * * petroleum products, from the * * * Property onto or into [appellant's] adjoining and neighboring properties" resulting in damages. Appellant also alleges that appellee has "allowed a public nuisance to exist on the * * * Property, specifically leaking underground petroleum storage tanks."

ment of error, appellant argues that the trial court erred in dismissing appellant's action against appellee for failure to prosecute. Appellant contends that the dismissal of its case "because of the failure of the trial court to set the case for trial is an extremely harsh sanction."

Civ.R. 41(B)(1) provides that "[w]here the plaintiff fails to prosecute, * * * the court upon motion of a defendant or on its own motion may, after notice to the plaintiff's counsel, dismiss an action or a claim." Fayette C.P.Loc.R. 16 provides in turn that "[c]ivil cases pending more than six months without any proceeding having been taken therein may be dismissed upon notice to the parties * * *." We note that pursuant to Civ.R. 41(B)(3), the trial court's dismissal of appellant's case was with prejudice.

■ While the primary duty is upon a plaintiff to prosecute his case and do all things necessary to make the case ready for trial assignment in a timely fashion, once the case is ready for trial assignment, the primary duty is upon the trial court to set the case for trial. *Korodi v. Minot* (1993), 89 Ohio App.3d 90, 94, 623 N.E.2d 627, 629–630.

In its memorandum contra appellee's motion to dismiss, appellant stated that "[a]lthough no progress has been made in this case since the Court's entry of October 7, 1994 [ruling on appellee's motion for summary judgment], there is no further discovery to be completed in this case, and [appellant] is waiting for this case to be set for trial of the remaining issues." Appellant contends that in light of the fact that the "trial court had taken nearly fifteen months[2] to rule on [appellee]'s Motion for Summary Judgment * * *, [appellant]'s counsel had reason to believe that the trial court's docket was extremely busy." There is no indication in the record as to why the case was not scheduled for trial.

■ We find that while the trial court failed to establish a trial date for appellant's case which was allegedly ready for trial, that does not excuse appellant's failure to make any inquiry of the trial court as to why its case had not been scheduled for trial. Dismissal was therefore warranted. We find, however, that the sanction of dismissal with prejudice was too harsh a sanction where the primary neglect was that of the trial court.

For the foregoing reasons, appellant's first assignment of error is well taken and sustained. The trial court's December 19, 1995 entry of dismissal is modified to a dismissal of the case without prejudice, and this cause is remanded to the trial court for implementation and execution of the modified judgment. *Korodi*, 89 Ohio App.3d at 95, 623 N.E.2d at 630–631.

---

2. The record shows that it actually took seventeen and one half months for the trial court to rule on appellee's motion for summary judgment.

In its second assignment of error, appellant argues that the trial court erred in granting summary judgment in favor of appellee with regard to appellant's claims of breach of contract, fraud, and negligent misrepresentation.

In reviewing a motion for summary judgment, the trial and appellate courts are held to the same standard.[3] That standard is governed by Civ.R. 56(C), which provides that summary judgment must be rendered when there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law, and reasonable minds could come to but one conclusion, and that conclusion is adverse to the party against whom the motion is made, who is entitled to have the evidence construed most strongly in his favor. *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 146, 524 N.E.2d 881, 883–884.

Appellant first argues that it was error for the trial court to grant summary judgment in favor of appellee with respect to appellant's claim of breach of contract. Appellant contends that the contract's financing contingency was a provision solely to benefit appellant by giving appellant the option to terminate the contract if it could not find acceptable financing. Appellant disputes appellee's position that the contract terminated on September 1, 1991 when the financing contingency was neither met nor released. Appellant also contends that there was a genuine issue of material fact as to whether the remediation of the contamination was a condition precedent to the closing of the contract.

In granting summary judgment in favor of appellee with regard to the breach of contract claim, the trial court found that the contract had lapsed by its terms thirty days after September 1, 1991. After thoroughly reviewing the record, we find that it supports the trial court's finding.

The contract clearly states that the contract will be performed and the transaction closed "within 30 days after contingencies are met or released, unless the parties agree in writing to an extension." All five amendments to the contract contained a financing contingency clause. Except for the date specified, each financing contingency clause stated that the contract was "contingent upon Buyer acquiring financing acceptable to Buyer on or before [a specific date]." The fifth and final amendment provided that the contract was "contingent upon Buyers acquiring financing acceptable to Buyers on or before September 1, 1991." Feinstein testified that appellant had always been willing, ready and able to buy the property, but that because of the "EPA problem," it had asked for an extension of the financing contingency beyond the September 1, 1991, extension which had been denied.

---

3. The foregoing standard of review will also apply to appellee's assignment of error in which appellee argues the trial court erred in denying in part appellee's motion for summary judgment.

■ Unlike the financing contingency clause, the language with regard to the remediation of the contamination appeared only in the third and fourth amendments. Both amendments state that "Seller agrees to comply with any and all requirements of BUSTR or any other governmental environmental regulatory body regarding environmental contamination" on the property or which had originated on the property. Furthermore, unlike the financing contingency clause, the remediation provision does not make the contract contingent upon completion of the remediation before the contract's closing. Rather, it clearly states that the remediation is an ongoing process. Agent testified that the remediation could not have been completed before September 1, 1991. Agent also testified that under the law, appellant was obligated to clean the property whether or not it owned it.

Agent sent a letter to Feinstein on July 29, 1991, reminding him that the contract would expire on September 1, 1991. While Feinstein testified that he never received the letter, Feinstein also testified that he had never asked for a closing on the property. As previously stated, Feinstein's request to Agent for an extension of the financing contingency beyond September 1, 1991, had been denied. In light of all of the foregoing, we find that the trial court did not err in granting summary judgment in favor of appellee with regard to the breach of contract claim.

Appellant also argues that the trial court erred in granting summary judgment to appellee with regard to appellant's claims of fraud and negligent misrepresentation. Both claims are based on Agent's alleged representation to Feinstein that since appellee had refused to extend the financing contingency beyond September 1, 1991, it would instead grant appellant a right of first refusal for the purchase of the property.

The elements of an action in fraud are (1) a false representation concerning a fact, (2) knowledge of the falsity of the representation or utter disregard for its truthfulness, (3) intent to induce reliance upon the representation, (4) justifiable reliance upon the representation, and (5) injury proximately caused by the reliance. *Gaines v. Preterm–Cleveland, Inc.* (1987), 33 Ohio St.3d 54, 55, 514 N.E.2d 709, 711–712.

■ With regard to negligent misrepresentation, in *Haddon View Invest. Co. v. Coopers & Lybrand* (1982), 70 Ohio St.2d 154, 24 O.O.3d 268, 436 N.E.2d 212, the Supreme Court of Ohio recognized negligent misrepresentation in limited circumstances as the basis for a cause of action and cited with approval 3 Restatement of the Law 2d, Torts (1977) 126–127, Section 552, which provides that "[o]ne who * * * supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise

reasonable care or competence in obtaining or communicating the information." *Id.* at 157, 24 O.O.3d at 269, 436 N.E.2d at 215. "[F]alse information and reliance are necessary [elements] for a cause of action in negligent representation." *Zuber v. Ohio Ins. Dept.* (1986), 34 Ohio App.3d 42, 45, 516 N.E.2d 244, 247.

In granting appellee's motion for summary judgment with regard to appellant's claims of fraud and negligent misrepresentation, the trial court found that appellant could not justifiably rely on Agent's representation that appellee would provide appellant with a right of first refusal.

 The question of justifiable reliance is one of fact and requires an inquiry into the relationship between the parties. *Lepera v. Fuson* (1992), 83 Ohio App.3d 17, 26, 613 N.E.2d 1060, 1065–1066. Reliance is justified if the representation does not appear unreasonable on its face and if, under the circumstances, there is no apparent reason to doubt the veracity of the representation. *Id.*

Agent testified that at the May 24, 1991 meeting, Feinstein asked for an extension of the financing contingency beyond September 1, 1991. Thereafter, during a telephone conversation, Agent refused to grant another extension but suggested to give appellant a right of first refusal. Agent told Feinstein, however, that Agent first needed to talk to appellee's counsel and that Agent would get back to Feinstein. Both Agent and Feinstein testified that the right of first refusal had only been discussed in general terms. On July 29, 1991, Agent sent a letter to Feinstein reminding him of the September 1, 1991 deadline. Thereafter, on August 26, 1991, Agent told Feinstein that appellee's counsel had advised against granting a right of first refusal. Agent, however, also told Feinstein that Agent wanted to talk to appellee's real estate broker before making a final decision. Agent testified that sometime between August 27 and September 1, 1991, he talked to Feinstein over the telephone and told him that the real estate broker had advised against granting a right of first refusal.

Feinstein testified that he asked for an extension of the financing contingency beyond September 1, 1991, which was refused by appellant. Feinstein testified that Agent subsequently told Feinstein that appellee would give appellant a right of first refusal and would not "sell [the property] out from under [appellant]." Handwritten notes taken by Feinstein during a telephone conversation with Agent in August 1991 state that Agent "said he will not accept an extension—he will call us if he gets an offer." Feinstein testified he viewed Agent's "verbal right of first refusal" as a verbal extension of the contract.

 After reviewing the record, we agree with the trial court that justifiable reliance, a necessary element for both a fraud claim and a negligent misrepresentation claim, was not present in the case at bar. Appellant, through Feinstein, was well aware that its request for an extension beyond September 1, 1991 had

been denied. While the parties talked about a possible right of first refusal, they also both testified that they had never discussed it in specific terms, such as how it would work and how long it would apply. For appellant to have viewed the parties' general conversation about a right of first refusal as a verbal extension of the contract contradicts and is not supported by (1) the contract which clearly provides for extensions to be in writing, and (2) the fact that all five extensions of the financing contingency had been in writing.

. We therefore find that the trial court properly granted summary judgment in favor of appellee with regard to appellant's claims of fraud and negligent misrepresentation. Appellant's second assignment of error is overruled.

On cross-appeal, appellee argues that the trial court erred in denying its motion for summary judgment with regard to trespass and public nuisance. Appellee argues that it was entitled to summary judgment on these claims because appellant has failed to produce any evidence of pollution on its adjoining property and/or resulting damages.

 Trespass is an invasion of the possessory interest in property. *Smith v. John Deere Co.* (1993), 83 Ohio App.3d 398, 407, 614 N.E.2d 1148, 1154–1155. Ohio law recognizes that every unauthorized entry upon the land of another constitutes a trespass. *Pembaur v. Cincinnati* (S.D.Ohio 1990), 745 F.Supp. 446, 456. "A plaintiff who has proven that the defendant's conduct amounted to trespass is entitled to recover the amount of the actual damages suffered, if any." *Id.,* citing *Holeton v. Ellison* (App.1952), 64 Ohio Law Abs. 214, 111 N.E.2d 399.

 "To constitute a nuisance, either public or private, the thing or act complained of * * * must either cause injury to the property of another, [or] obstruct the reasonable use or enjoyment of his property * * *." *State ex rel. Chalfin v. Glick* (1960), 113 Ohio App. 23, 27, 17 O.O.2d 33, 35, 177 N.E.2d 293, 297. Public nuisance is defined as an unreasonable interference with a right common to the general public. *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 712, 622 N.E.2d 1153, 1158–1159, citing Restatement of the Law 2d, Torts (1979) 87, Section 821B. Public nuisance "affects the public at large or such of them as may come in contact with it * * *, [by] injuriously affect[ing] the safety, health * * * of the public, or work[ing] some substantial annoyance, inconvenience, or injury to the public." *Chalfin,* 113 Ohio App. at 26–27, 17 O.O.2d at 35, 177 N.E.2d at 296.

In the case at bar, it is undisputed that the property was contaminated. In a letter to Feinstein dated April 27, 1990, Wilcox stated, "As you know, we have discovered significant environmental contamination on [the property]." The letter further states:

"The Ohio Bureau of Underground Storage Regulation is working with us and has approved an interim remediation plan involving on site pumping wells which will be totally underground and connected by underground piping to a location on our adjoining site. The water will then be monitored and placed into the public sewer system. We are also doing further soil borings and will remove contaminated soil and treat it as necessary.

"In addition, Omega will continue to investigate the possibility of off site contamination on both the Kentucky Fried Chicken property and the Messmore property. We are currently awaiting results of monitoring wells installed at the eastern edge of the Omega property to determine the necessity of further testing on the Messmore site. Our consultants will be testing the Kentucky Fried Chicken site in the very near future. Of course, if any of this property off site is deemed to be contaminated due to Omega activities, we will make the necessary corrections to the property."

In his deposition on November 2, 1992, Agent testified that "heavy areas of contaminated soil" had been taken out of the property and that appellant and Omega were waiting for test results to determine what further, if anything, needed to be done. Agent testified that when he received Feinstein's January 31, 1992 letter, the remediation was still in process. Agent also testified that as of the day of the deposition, his understanding was that the environmental contamination of the property had not spread to adjoining properties. Agent testified his understanding was based on a conversation with Bruck, Hartman & Esposito, an environmental consulting firm that was then overseeing the remediation work on the property. Attached to appellee's motion for summary judgment was a letter dated November 13, 1992 from Bruck, Hartman & Esposito. The letter states in relevant part:

"As you requested in your letter of November 6, 1992, BHE has reviewed soil and groundwater data relevant to the property owned by Crown Development (Crown) due East of Omega's active truck stop in Jeffersonville, Ohio.

" * * *

"All groundwater analyses of the samples described above show no evidence of petroleum contamination. There were slight 'hits' of both total and dissolved lead in the initial water samples collected from MW–29 and MW–30. Because the lead concentration in both groundwater samples and in soil samples were [sic] so low, Omega was not required by BUSTR to perform additional lead monitoring. The soil sample collected from MW–30 at the 2–4 foot level showed a TPH concentration of 110 ppm and a total lead concentration of 38 ppm.

"The pump and treatment system that has active recovery wells in the proximity of the eastern property line is apparently performing to the degree

that it is not allowing migration of petroleum contaminants to the observation wells mentioned above. Although the soil TPH and lead concentrations in the soil sample collected near the surface in MW–30 are slightly elevated they do not poise [sic] a threat to human health or the environment.

A map of the Interstate Highway I–75 and U.S. Route 35 area in Fayette County shows that the property is bordered on three sides by several properties, two of them being owned by appellant, one of them being called the Messmore property. On January 12, 1990, Feinstein sent a letter to Wilcox which states:

"On November 8, 1989, I sent you by Federal Express a two-page letter and a copy of an EPA study by Westinghouse. I did not hear from you after sending you these materials and then followed up with a telephone call and again did not hear from you. I thought we have had excellent cooperation and I am very surprised to have not heard from you as a result of either my letter or my telephone call.

"Mr. Richard Souyoul, the developer putting together the project in the rear, told me that he talked to your office and got permission for his engineer to call your engineer and that it was his understanding that your engineer had recommended a study to determine where the leak came from on Mr. Souyoul's property (I presume the leak is also on the property we have under contract because that property is between your gas station and the property where Westinghouse found the problem). Mr. Souyoul further understood that you did not authorize your engineering firm to undertake this study."

Feinstein testified that Richard Souyoul, a developer on a lot located to the rear of the property, had an EPA report done by Westinghouse which showed contamination on Souyoul's lot. Souyoul told Feinstein that the Westinghouse report linked the contamination on Souyoul's lot to the spillage on the property. Feinstein testified that "as a courtesy, [he] sent the report to Bill Wilcox, [to make] Bill Wilcox aware of Richard Souyoul's problems * * *."

Feinstein testified that "[he] had evidence from Bruck, Hartman & Esposito after they completed their tests * * * that there was a part of the Messmore piece that had been contaminated." Feinstein later testified that after Omega tested the Messmore property, Omega admitted that it was contaminated. Feinstein testified that due to the contamination on the Messmore property, appellant had been unable to develop it even though it had been approached by several companies to put a motel and a fast food restaurant on it.

After thoroughly reviewing the record, including the parties' foregoing testimony, we find that the trial court did not err in denying appellee's motion for summary judgment with regard to appellant's claims of trespass and public nuisance. Construing the evidence most strongly in appellant's favor, we find

that reasonable minds could reach different conclusions as to whether the contamination on the property had spread onto all the adjoining properties, including appellant's properties. Appellee's cross assignment of error is overruled.

The judgment is modified in part and affirmed in part and the cause is remanded.

*Judgment accordingly.*

WALSH, P.J., and KOEHLER, J., concur.