[Cite as *Morgan v Cohen*, 2019-Ohio-3662.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

MICHAEL MORGAN, ET AL.                    :

    Plaintiffs-Appellants/
    Cross-Appellee,                    :

                                    No. 107955

v.                    :

BENJAMIN ROSS COHEN, ET AL.                    :

    Defendants-Appellees/
    Cross-Appellant.                    :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 12, 2019

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-17-886008

---

## *Appearances:*

Coakley Lammert Co. L.P.A., Cynthia A. Lammert, George S. Coakley, and Richard T. Lobas, *for appellants/cross-appellees.*

Wachter Kurant, L.L.C. and Mark I. Wachter, *for appellees/cross-appellants* Benjamin Ross Cohen and Meg Gerstenblith.

Reminger Co., L.P.A., Aaren R. Host, and Brian D. Sullivan, *for cross-appellees* Northeast Real Estate Group, L.L.C. and Nicole Frantz.

EILEEN A. GALLAGHER, J.:

{¶ 1} This case involves a dispute arising out of a residential real estate transaction between plaintiffs-appellants Michael Morgan and Hannah Arnson (collectively, "buyers") and defendants-appellees/third-party plaintiffs-cross-appellants Benjamin Cohen and Meg Gerstenblith (collectively, "sellers"). Buyers appeal the trial court's decision granting sellers' motion for summary judgment on buyers' claims for fraudulent misrepresentation and fraudulent inducement and denying buyers' motion for partial summary judgment on the issue of liability, arising out of special assessments which buyers were required to pay after they purchased a condominium unit from sellers. Sellers cross-appeal the trial court's denial of their motion for summary judgment against third-party defendants-cross-appellees Northeast Real Estate Group, L.L.C. and Nicole Frantz (collectively, "Northeast"), who served as sellers' real estate agent in the transaction, on their claims for contribution and indemnification.

{¶ 2} For the reasons that follow, we affirm the trial court's judgment.

**Factual Background and Procedural History**

{¶ 3} In May 2015, buyers agreed to purchase a residential condominium unit from sellers. The condominium unit, unit #311 (the "condominium unit," the "unit" or the "property"), was one of approximately 13 condominium units in Random Road Lofts, a three-story apartment-style condominium complex, located at 2079 Random Road in the Little Italy area of Cleveland (collectively, the "condominium complex," the "complex" or the "building"). The owners of units in

the complex were members of the Random Road Lofts Condominium Owners Association (the "condominium association").

{¶ 4} Sellers purchased the condominium unit in 2011. In 2014, sellers decided to list the unit for sale. They retained Northeast as their real estate agent to assist them in selling the property and listed the unit for sale in the winter of 2015.

**Water Issues in the Complex**

{¶ 5} During the time sellers owned the unit, they experienced few problems with it. Sellers were aware, however, that owners of certain other units had experienced problems with water leaking into their units from outside. Sellers were also aware of a problem with a support beam over the driveway of the complex.

{¶ 6} Beginning in or around 2012, the condominium association hired consultants to investigate the cause of the water problem and retained counsel to negotiate with Fortney & Weygant, Inc. ("F&W"), the builder of the complex, and its insurer, CNA, in an effort to get them to make repairs and/or indemnify the association and affected unit owners for the cost of repairs and damages due to construction defects allegedly causing the water problem. The investigation and negotiations continued for several years. Unit owners were kept apprised of the status of the investigation and negotiations during association meetings — some of which sellers attended — and through meeting minutes and related correspondence, which the association sent to unit owners.

{¶ 7} Although sellers attended certain association meetings and received minutes from meetings where construction issues and the retention of consultants

and attorneys to investigate and resolve these issues were discussed, sellers denied knowledge of any existing structural problems or any defects affecting common areas or the complex as a whole — other than the issue with the driveway support beam — prior to the sale. Sellers likewise denied knowledge that unaffected unit owners would be assessed additional fees to remedy the construction issues or to pay the consultants and attorneys involved in the investigation and negotiations related to the construction issues.

{¶ 8} Cohen testified that it was his understanding that "there were some issues with other units in our building," that "they were being dealt with" and that the problems "were specific to the individual units and were not * * * indicative of an endemic problem, with the building." Cohen further testified that he believed either the owners of the affected units or the insurance company would be paying to fix those problems and that "this really didn't affect our unit, and, fortunately, * * * wouldn't affect us." Gerstenblith similarly testified that she believed the issue was a matter of "getting the individual unit owners who had damage to their units, their repairs paid for and addressed," which "did not seem relevant to us," because sellers' unit had sustained no damage. Gerstenblith stated that it was her understanding that the association was involved because multiple units were affected but that the costs to repair the affected units would be paid by the owners of those units or the builder or its insurer.

{¶ 9} In April 2015, the condominium association entered into a tolling agreement with F&W relating to the association's "claims * * * for relief against the

Company in connection with improper construction of the buildings on the premises referred to as the Random Road Lofts" to "facilitate settlement negotiations between the Parties." The president of the condominium association signed the agreement on behalf of the condominium association. Sellers also signed the tolling agreement as "individual unit owners" on May 6, 2015. The tolling agreement expired on August 30, 2015.

**The Purchase Agreement, Sellers' Disclosures and Buyers' Due Diligence**

{¶ 10} On May 19, 2015, sellers completed an Ohio residential property disclosure form ("RPDF") for the property, as required by R.C. 5302.30. In the disclosure form, sellers represented that they had no knowledge of any "material defects in or on the property" or "any recent or proposed assessments, fees or abatements, which could affect the property." Sellers also completed a "condominium addendum" and a "condominium, cluster home, or planned unit development information" form (the "condominium disclosure form").[1] In the condominium addendum, sellers disclosed that the property was subject to maintenance fees of $1,500 per quarter and warranted that there were no other "(a) additional fees; (b) proposed or voted assessments; or (c) maintenance fee increases." In the condominium disclosure form, sellers indicated that there were no "other fees, other than the monthly maintenance fee, that unit owners must pay, e.g., assessments, reserve fund contributions" and that sellers had no knowledge of

---

[1] The RPDF, condominium addendum and condominium disclosure form are collectively referred to herein as the "disclosures" or the "disclosure forms."

any pending litigation by or against the association or "any increased fees, expenses, or assessments under consideration by the board or association." Gerstenblith testified that prior to completing the disclosure forms, she contacted her real estate agent, Nicole Frantz, and inquired whether she needed to disclose the water damage that had occurred in other units in the RPDF. She also contacted one of the association's board members and confirmed that the association was not involved in any pending litigation.

{¶ 11} On May 21, 2015, Arnson contacted Lynn Singer, an acquaintance of Arnson's mother and then-secretary of the condominium association, to find out more about the building. Arnson testified that she inquired "about the building, her general opinion and thoughts of how everything was going." Although the Singers' unit was one of the units that had sustained water damage, Arnson testified that Singer had only "positive things to say" and told her that "they love the building." Arnson testified that Singer made no mention of any structural problems with the building, water leaks or construction defects. Other than their receipt of the disclosures, buyers had no conversations or other communications with sellers regarding the unit, the condition of the building or the potential for litigation or additional charges or assessments prior to the sale.

{¶ 12} On May 27, 2015, the parties entered into a purchase agreement for the property. The agreement stated that the property was "being purchased in its 'AS IS' PRESENT PHYSICAL CONDITION" and was contingent upon the results of a professional general home inspection by buyers. The purchase agreement

incorporated the RPDF, the condominium addendum and the condominium information form, which were executed by both sellers and buyers.

**{¶ 13}** Buyers arranged for a general home inspection of the property by a professional inspector. Following the inspection, buyers agreed to waive the inspection contingency in the purchase agreement provided sellers made certain repairs and certain credits were issued against the purchase price. The repairs were made and the credits were issued.

**{¶ 14}** In the condominium addendum, sellers agreed to provide current and complete copies of the declaration, bylaws and rules and regulations of the condominium association, to buyers. Buyers, in turn, agreed to review and decide whether to approve these documents. Buyers further "agree[d] to consult with the Association and to inspect and make diligent inquiry about all aspects of the Property, its condition and systems, the condominium development, and its management and operations. This includes, without limitation, declarations and by-laws, professional management, board/association meeting minutes, fees, expenses, adequacy of reserve funds, budgets, rules and regulations * * * and all use and occupancy restrictions." (Emphasis deleted.) In the condominium disclosure form, buyers "acknowledged" "having been advised to inspect and make diligent inquiry about all aspects of the Property, its conditions and systems, the condominium development, and its management and operations. This includes, without limitation, the documents provided by Seller, board/association meeting

minutes, reserve funds, budgets, and use and occupancy restrictions." (Emphasis deleted.)

{¶ 15} Buyers testified that, prior to closing on the property, they reviewed the declaration, the bylaws, the rules and regulations and reserve funds of the association, a proposed association budget and use and occupancy restrictions. Buyers, however, did not review any of the association's meeting minutes or "make inquiry" of any association board members or residents other than Singer regarding the association, the condition of the complex or its management and operations. Buyers testified that "[d]ue to sellers' representations regarding the condition of the property, a lack of contemplated litigation, and a lack of contemplated assessments, we did not investigate further." On June 20, 2015, buyers signed the condominium addendum indicating that they had "reviewed and approved" the condominium documents and "removed the contingency relating to [buyer's] review and approval of them."

{¶ 16} On July 9, 2015, title on the property transferred from sellers to buyers. That same day, buyers received notice of a condominium association meeting scheduled for July 22, 2015 regarding the status of negotiations with F&W relating to construction defects.

{¶ 17} Buyers attended the July 22, 2015 condominium association meeting. Buyers testified that, at the meeting, they learned for the first time that there were "concerns about the construction of the building * * * along with negotiations and a potential lawsuit" and "the potential for special fee assessments to be levied against

[a]ssociation members to fund investigation and litigation related to the construction defects" with the building. Buyers testified that they would not have purchased the property had they been "made aware of the construction defects, potential litigation, the [a]ssociation's negotiations with the builder, and the potential for assessments."

**Litigation by the Association and Special Assessments**

{¶ 18} In August 2015, the condominium association filed suit against F&W and others involved in the construction of the building for improper construction and unworkmanlike performance based on alleged construction defects related to the water intrusion. The case settled in or around January 2017.

{¶ 19} Beginning in September 2015, various special assessments were levied against unit owners to cover legal expenses and remediation costs that were not covered by the settlement. Buyers testified that they paid nearly $60,000 in special assessments to the condominium association in 2016 and 2017 to cover their share of these costs and expenses.[2]

**Buyers' Lawsuit against Sellers**

{¶ 20} In early 2017, in preparation for litigation against sellers, buyers reviewed, for the first time, the association meeting minutes for the time period prior to the sale. Arnson testified that if she had seen the meeting minutes prior to purchasing the unit, she would have been "concerned" about purchasing the

---

[2] It is unclear from the record precisely what construction defects existed, what remediation work was performed to remedy those construction defects and what the various special assessments were for.

property or "questioned" it due to references in the meeting minutes to "ongoing construction issues and structural concerns," "damage affecting the integrity of the building" and "discussions with legal counsel" regarding "unfixed repairs and ongoing issues." Morgan testified that if he had reviewed the meeting minutes and "seen all of these conditions" prior to the sale, he would not have purchased the property.

{¶ 21} On September 15, 2017, buyers filed a complaint, asserting claims of breach of contract, fraudulent misrepresentation and fraudulent inducement against sellers. Buyers alleged that sellers had made various false representations on the RPDF, condominium addendum and condominium disclosure form regarding their knowledge of material defects in the property, additional or proposed assessments, expenses or fees relating to the property and pending lawsuits involving the property. Buyers claimed that they had justifiably relied on sellers' misrepresentations, that sellers' misrepresentations were material to their decision to purchase the property and that sellers had made the misrepresentations with knowledge of their falsity, with reckless disregard for their truthfulness or with actual malice to induce them to purchase the property. Buyers sought to recover both compensatory and punitive damages, plus interest, costs and attorney fees from sellers.

{¶ 22} Sellers filed an answer and a third-party complaint against Northeast. In their answer, sellers denied the material allegations of buyers' complaint and asserted various affirmative defenses. In their third-party complaint, sellers alleged

that Northeast had assisted sellers in the completion of the RPDF, the condominium addendum and the condominium disclosure form and that, to the extent buyers were entitled to recover from sellers, sellers were entitled to contribution or indemnification from Northeast for providing negligent information and advice with respect to the completion of these forms. Northeast filed an answer denying these allegations and asserting a laundry list of affirmative defenses.

**Motions for Summary Judgment**

{¶ 23} The parties filed cross-motions for summary judgment. Sellers filed a motion for summary judgment on all buyers' claims arguing that (1) sellers' representations on the RPDF were not fraudulent because they had no duty to disclose any conditions outside their unit to buyers; (2) buyers were barred from recovery because they had failed to conduct their own due diligence prior to purchasing the property and (3) buyers could not establish their damages with reasonable certainty.[3]

---

[3] In support of their motion for summary judgment (and in opposition to buyers' motion for summary judgment), sellers submitted copies of: (1) a document entitled "Random Road Lofts Sales and Condominium Ownership Documents"; (2) the purchase agreement, amendment to offer to purchase and removal of contingency, RPDF, condominium addendum and condominium disclosure form; (3) the proposed 2015 operating budget for the association; (4) buyers' inspection report for the property; (4) correspondence between Gerstenblith and Mark Singer, dated April 2015, in which Singer confirmed that the association was not "actively involved in any lawsuits"; (5) correspondence between Arnson and Morgan regarding Arnson's May 2015 conversation with Lynn Singer; (6) select association meeting minutes from 2011-2014; (7) invoices for special assessments from the association; (8) an association "Mediation [sic] Project Summary," dated March 2, 2018, detailing improvements made at the complex from October 2016 through February 2018; and (9) the transcripts of Arnson and Morgan's depositions.

**{¶ 24}** Buyers filed a motion for partial summary judgment as to liability on their claims for fraudulent misrepresentation and fraudulent inducement, arguing that there was no genuine issue of material fact that (1) sellers had intentionally misrepresented, failed to disclose and concealed material facts regarding construction defects affecting the property, the potential for litigation involving the property and the likelihood of future assessments to finance the investigation, litigation and repairs, (2) buyers had justifiably relied on sellers' misrepresentations and concealment in purchasing the property and (3) buyers had been required to pay approximately $60,000 in special assessments due to sellers' fraud.[4]

**{¶ 25}** Northeast filed a motion for summary judgment on sellers' claims for contribution and indemnification on the ground that there was no evidence that Northeast had any knowledge of any potential assessments or pending litigation involving the condominium association.[5]

---

[4] In support of their motion for summary judgment on liability (and in opposition to sellers' motion for summary judgment), buyers submitted: (1) affidavits from Arnson and Morgan regarding their reliance on sellers' representations; (2) copies of the purchase agreement, RPDF, condominium addendum and condominium disclosure form; (3) excerpts from the depositions of Cohen and Gerstenblith; (4) copies of select association meeting minutes and correspondence; and (5) the tolling agreement.

[5] In support of its motion for summary judgment, Northeast submitted: (1) an affidavit from Frantz; (2) excerpts from the depositions of Morgan, Cohen and Gerstenblith; and (3) copies of the RPDF, condominium addendum and condominium disclosure form.

**The Trial Court's Decision**

{¶ 26} On November 6, 2018, the trial court granted sellers and Northeast's motions for summary judgment and denied buyers' motion for partial summary judgment on liability. The trial court held that buyers' breach of contract claim was barred by the "as is" clause in the purchase agreement and the doctrine of caveat emptor. With respect to buyers' fraud claims, the trial court held that there was no evidence that sellers' disclosures were false and that "[b]ased on *Ritter* [*v. Cahill*, 8th Dist. Cuyahoga No. 77790, 2001 Ohio App. LEXIS 3720 (Aug. 23, 2001)]," sellers "did not have a duty to disclose conditions in the common areas or other units owned by other parties." The trial court further held that, because buyers had an opportunity to inspect the meeting minutes and had failed to do so, buyers were "'charged with knowledge of the conditions that a reasonable inspection would have disclosed,'" quoting *Pedone v. Demarchi*, 8th Dist. Cuyahoga No. 88667, 2007-Ohio-6809, ¶ 32, and could not establish that their reliance was justified or that sellers "had a duty to speak." Because it had granted sellers' motion for summary judgment, the trial court found that Northeast was entitled to summary judgment on sellers' derivative claims for indemnification and contribution.

{¶ 27} Buyers appealed, raising the following two assignments of error for review:

> FIRST ASSIGNMENT OF ERROR: The Trial Court erred in granting summary judgment to Defendants-Appellees Meg Gerstenblith and Benjamin Cohen.

SECOND ASSIGNMENT OF ERROR: The Trial Court erred in denying Plaintiffs-Appellants Michael Morgan and Hannah Arnson's Motion for Partial Summary Judgment on Liability.

{¶ 28} Sellers cross-appealed, raising the following cross-assignment of error for review:

If the trial court erred by granting summary judgment in favor of the appellees, and denying summary judgment in favor of the appellants, then the trial court erred by granting summary judgment to the third-party defendant/cross-appellees.

## Law and Analysis

### Standard of Review

{¶ 29} We review summary judgment rulings de novo, applying the same standard as the trial court. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). We accord no deference to the trial court's decision and conduct an independent review of the record to determine whether summary judgment is appropriate.

{¶ 30} Under Civ.R. 56, summary judgment is appropriate when no genuine issue exists as to any material fact and, viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion that is adverse to the nonmoving party, entitling the moving party to judgment as a matter of law.

{¶ 31} On a motion for summary judgment, the moving party carries an initial burden of identifying specific facts in the record that demonstrate his or her entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). If the moving party fails to meet this burden, summary

judgment is not appropriate; if the moving party meets this burden, the nonmoving party has the reciprocal burden to point to evidence of specific facts in the record demonstrating the existence of a genuine issue of material fact for trial. *Id.* at 293. Summary judgment is appropriate if the nonmoving party fails to meet this burden. *Id.*

### Buyers' Motion for Summary Judgment on Fraud Claims against Sellers

{¶ 32} In its first assignment of error, buyers argue that the trial court erred in granting summary judgment in favor of sellers on buyers' claims for fraudulent misrepresentation and fraudulent inducement[6] because the trial court "erroneously concluded" that sellers did not make any misrepresentations to buyers and that buyers did not justifiably rely on any alleged misrepresentations by sellers. Buyers contend that the trial court's decision should be reversed because, "[a]t [a] minimum," genuine issues of material fact exist as to "both of these points."

{¶ 33} Buyers' fraud claims are based on the representations sellers made in the RPDF, the condominium addendum and the condominium disclosure form. Buyers assert that, based on the information reported in the association meeting minutes and sellers' execution of the tolling agreement, sellers knew at the time of the sale that (1) there were construction defects that affected all unit owners, (2) litigation was being contemplated by the association against various entities involved in the construction of the complex, (3) the association (and, ultimately, all

---

[6] Buyers do not dispute that the trial court properly entered summary judgment on their breach of contract claim. Accordingly, we do not address that claim here.

unit owners) would bear any expense for repairs and (4) if the tolling agreement expired before a resolution was reached with respect to the construction defects, litigation would ensue and the association (and, ultimately, all unit owners) would be responsible for paying the litigation expenses.

{¶ 34} Buyers argue that the trial court's determination that sellers' disclosures were not misrepresentations is "unsupported by * * * the record" and is "inconsistent with" R.C. 5302.20 and "well-settled Ohio law requiring sellers of real property to make full, good-faith disclosures." Buyers further contend that these statements by sellers "conveyed a false impression" to buyers and that by "with[holding] all information" from buyers regarding "construction defects, past repairs, investigations, contemplated litigation, and the financial impact of those items on [a]ssociation members," sellers engaged in fraud. We disagree.

{¶ 35} As a general rule, Ohio follows the doctrine of caveat emptor in real estate transactions, which precludes a purchaser from recovering for a structural defect if: "(1) the condition complained of is open to observation or discoverable upon reasonable inspection; (2) the purchaser had the unimpeded opportunity to examine the premises; and (3) there is no fraud on the part of the vendor." *Layman v. Binns*, 35 Ohio St.3d 176, 519 N.E.2d 642 (1988), syllabus. "'The doctrine of caveat emptor is designed to finalize real estate transactions by preventing disappointed real estate buyers from litigating every imperfection existing in residential property.'" *Psarras v. Rayburn*, 11th Dist. Geauga No. 2018-G-0181, 2019-Ohio-2168, ¶ 54, quoting *Thaler v. Zovko*, 11th Dist. Lake No. 2008-L-091,

2008-Ohio-6881, ¶ 31. However, a seller may still be liable to a buyer if the seller fails to disclose known latent conditions. *See, e.g., Binns* at 178 ("a vendor has a duty to disclose material facts which are latent, not readily observable or discoverable through a purchaser's reasonable inspection"); *see also Roberts v. McCoy*, 2017-Ohio-1329, 88 N.E.3d 422, ¶ 18 (12th Dist.) (R.C. 5302.30 "does not displace" a seller's common law duty to a buyer "'to disclose material facts which are latent' when the seller possesses actual knowledge of the defect at the time of the transaction"), quoting *Binns* at 178.

{¶ 36} The elements of fraud[7] are: (1) a representation of fact (or where there is a duty to disclose, concealment of a fact); (2) that is material to the transaction at issue; (3) made falsely, with knowledge of its falsity or with utter disregard and recklessness as to whether it is true or false; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the misrepresentation (or concealment); and (6) resulting injury proximately caused by the reliance. *Cohen v. Lamko, Inc.*, 10 Ohio St.3d 167, 169, 462 N.E.2d 407 (1984).

{¶ 37} While caveat emptor still applies, R.C. 5302.30 requires that a seller of residential property complete and deliver to a prospective purchaser an RPDF disclosing "material matters relating to the physical condition of the property" and

_____

[7] This court has held that the elements of fraudulent inducement and fraudulent misrepresentation are "'essentially the same.'" *Cantlin v. Smythe Cramer Co.*, 2018-Ohio-4607, 114 N.E.3d 1260, ¶ 37 (8th Dist.), quoting *Pedone*, 2007-Ohio-6809, at ¶ 29. Accordingly — and because buyers' claims of fraudulent misrepresentation and fraudulent inducement are based on the same alleged facts and evidence — we "treat" buyers' fraudulent misrepresentation and fraudulent inducement claims "as one." *Cantlin* at ¶ 37.

"any material defects in the property" that are "within the actual knowledge" of the seller. R.C. 5302.30(C), (D); *see also Hendry v. Lupica*, 8th Dist. Cuyahoga No. 105839, 2018-Ohio-291, ¶ 7 ("'R.C. 5302.30 requires sellers of real estate to disclose patent or latent defects that are within their actual knowledge on a residential property disclosure form."), quoting *Wallington v. Hageman*, 8th Dist. Cuyahoga No. 94763, 2010-Ohio-6181, ¶ 17. R.C. 5302.30(E)(1) provides that "[e]ach disclosure of an item of information that is required to be made in the property disclosure form * * * and each act that may be performed in making any disclosure of an item of information shall be made or performed in good faith." "Good faith" means "honesty in fact." R.C. 5302.30(A)(1).

{¶ 38} If a seller fails to disclose a material fact on the RPDF with the intention of misleading the buyer and the buyer relies on the RPDF, the seller may be liable for a resulting injury. *Wallington*, 2010-Ohio-6181, at ¶ 18; *Pedone*, 2007-Ohio-6809, at ¶ 31. However, where, a party "'has had the opportunity to inspect the property, he is charged with knowledge of the conditions that a reasonable inspection would have disclosed.'" *Pedone* at ¶ 33, quoting *Nunez v. J.L. Sims Co., Inc.*, 1st Dist. Hamilton No. C-020599, 2003-Ohio-3386, ¶ 17. Sellers of residential real property have no duty to inspect their property or to otherwise acquire additional knowledge regarding defects on their property. *Roberts*, 2017-Ohio-1329, 88 N.E.3d 422, at ¶ 17. "[T]the duty to conduct a full inspection falls on the purchasers and the disclosure form does not function as a substitute for such careful inspection." *Id.*

**{¶ 39}** In this case, the purchase agreement states that the property is being sold in its "'as is' present physical condition." "An 'as is' sale indicates that the buyer has agreed to 'make his or her own appraisal' 'and accept the risk' of making the wrong decision." *AE Prop. Servs., L.L.C. v. Sotonji*, 8th Dist. Cuyahoga No. 106967, 2019-Ohio-786, ¶ 23, quoting *McDonald v. JP Dev. Group, L.L.C.*, 8th Dist. Cuyahoga No. 99322, 2013-Ohio-3914, ¶ 15. An "as is" clause in a real estate purchase agreement relieves a seller of the duty to disclose latent defects and precludes a claim against a seller based on "passive" nondisclosure. *See, e.g., Pedone* at ¶ 34; *McClintock v. Fluellen,* 8th Dist. Cuyahoga No. 82795, 2004-Ohio-58, ¶ 18; *Brown v. Lagrange Dev. Corp.*, 6th Dist. Lucas No. L-09-1099, 2015-Ohio-133, ¶ 20. It does not, however, protect a seller from liability for "positive" acts of fraud, i.e., "'a fraud of commission rather than omission,'" such as fraudulent misrepresentation or fraudulent concealment, including fraudulent misrepresentations in an RPDF. *Brown* at ¶ 20, quoting *Majoy v. Hord*, 6th Dist. Erie No. E-03-037, 2004-Ohio-2049, ¶ 18; *Pedone* at ¶ 34; *McClintock* at ¶ 18.

**{¶ 40}** Following a thorough, independent review of the record, we find no genuine issues of material fact as to buyers' fraud claims.

### Sellers' Alleged Fraudulent Misrepresentations

**{¶ 41}** First, buyers have not pointed to any evidence in the record that any statements by sellers in the disclosures were false when made or that sellers actively "concealed" any material information from buyers. Buyers contend that the

following disclosures in the RPDF, condominium addendum and condominium disclosure form constituted material, fraudulent misrepresentations:

<u>In the RPDF</u>

- STRUCTURAL COMPONENTS (FOUNDATIONS, BASEMENT, CRAWL SPACE, FLOORS, INTERIOR AND EXTERIOR WALLS): Do you know of any previous or current movement, shifting, deterioration, material crack/settling (other than visible minor cracks or blemishes) or other material problems with the foundation, basement/crawl space, floors or interior/exterior walls?

  No.

- Do you know of any recent or proposed assessments, fees or abatements, which could affect the property?

  No.

- The following are other known material defects in or on the property:

  None.

  For purposes of this section, material defects would include any non-observable physical condition existing on the property that could be dangerous to anyone occupying the property or any non-observable physical condition that could inhibit a person's use of the property.

<u>In the condominium addendum</u>

- SELLER warrants that there are no (a) additional fees; (b) proposed or voted assessments; or (c) maintenance fee increases, except as follows:

  None.

<u>In the condominium disclosure form</u>

- Are there any other fees, other than the monthly maintenance fee, that unit owners must pay, e.g., assessments, reserve fund contributions?

  No.

- Does Seller have knowledge of any new or increased fees, expenses, or assessments under consideration by the board or association?

  No.

- Does Seller have knowledge of any pending lawsuits by or against the association?

  No.

{¶ 42} With respect to sellers' representations regarding in the RPDF regarding the physical condition of the property, as buyers acknowledge in their brief, the RPDF "relates specifically to [s]eller's unit, while the [condominium addendum] and [condominium disclosure form] contain representations about the Lofts."[8] Buyers have not shown that there were any structural problems or other "material defects" with the unit at the time of the sale and have not identified any authority interpreting the RPDF as requiring the disclosure of "defects" outside the unit being sold.

{¶ 43} With respect to sellers' representation regarding "pending lawsuits," it is undisputed that there were no "pending" lawsuits by or against the association at the time of the sale. A lawsuit is "pending" from its inception until a final judgment is entered by a court. A lawsuit is not "pending" before a complaint

---

[8] The "property" is identified in the RPDF as "2079 Random Rd. #311."

initiating the lawsuit has been filed with the court. Here, there is no evidence that any lawsuit had been filed by, or against, the association at the time of the sale. Although the association had entered into a tolling agreement with F&W, the purpose of the tolling agreement was to allow negotiations to continue and to attempt a resolution without resorting to litigation. Sellers made no representations regarding the potential for or likelihood of future litigation by or against the association.

{¶ 44} With respect to sellers' representations regarding fees and assessments, it is undisputed that no fees or assessments other than the quarterly fee to the association — which was fully and accurately disclosed in the disclosures — had been charged or had been proposed to be charged against the owner of the unit prior to the sale. Although there is some discussion in the meeting minutes of hiring consultants and attorneys, there is nothing in the meeting minutes (or in the record otherwise) that indicates that, at the time of sale, unit owners who were not experiencing problems with water in their units would be required to pay (or that it had been proposed that such unit owners pay) any additional sums beyond the $1,500 quarterly association fee. Arnson admitted that there is nothing in the meeting minutes predating the sale "about charging unit owners something other than their regular monthly maintenance fees to handle any kind of additional expenses." That additional charges or assessments may have been possible in the future did not render sellers' representations false when made. *Compare Ritter*, 2001 Ohio App. LEXIS 3720 (affirming summary judgment in favor of sellers of

condominium unit on buyer's claim that sellers had actual knowledge of damage to common areas and pending assessments that they failed to disclose to buyer based on (1) caveat emptor, (2) the fact that "the conditions complained of all existed outside the unit," were not latent and were discoverable by buyer, did not conduct an inspection and (3) the lack of evidence that sellers made misstatements of material fact or had knowledge of pending assessments at the time of sale).

### Justifiable Reliance

{¶ 45}  Second, even if sellers had knowingly misrepresented a material fact or had concealed some material fact that they had a duty to disclose to buyers, there is no genuine issue of material fact that buyers could not have justifiably relied on sellers' misrepresentation or concealment when purchasing the property.

{¶ 46} In determining whether a party justifiably relied on a representation, courts consider all of the relevant circumstances, including the nature of the transaction, the form and materiality of the representation, the relationship of the parties and their respective knowledge and means of knowledge. *See, e.g., Kovacic v. All States Freight Sys.,* 8th Dist. Cuyahoga No. 69926, 1996 Ohio App. LEXIS 3474, 18 (Aug. 15, 1996); *McDonald v. Fogel*, 11th Dist. Trumbull No. 2018-T-0079, 2019-Ohio-1717, ¶ 20.  Justifiable reliance reflects "a balance between reliance and responsibility":

> "The rule of law is one of policy and its purpose is, while suppressing fraud on the one hand, not to encourage negligence and inattention to one's own interests.  There would seem to be no doubt that while in ordinary business transactions, individuals are expected to exercise reasonable prudence and not to rely upon others with whom they deal

to care for and protect their interests, this requirement is not to be carried so far that the law shall ignore or protect positive, intentional fraud successfully practiced upon the simple-minded or unwary."

*AmeriFirst Sav. Bank v. Krug*, 136 Ohio App.3d 468, 495-496, 737 N.E.2d 68 (2d Dist.1999), quoting 50 Ohio Jurisprudence 3d, Fraud and Deceit, Section 132 (1984).

{¶ 47} Generally, "[t]he 'question of justifiable reliance is one of fact.'" *Mar Jul, L.L.C. v. Hurst*, 4th Dist. Washington No. 12CA6, 2013-Ohio-479, ¶ 61, quoting *Crown Property Dev., Inc. v. Omega Oil Co.*, 113 Ohio App.3d 647, 657, 681 N.E.2d 1343 (12th Dist.1996). Where, however, no genuine issue of material fact exists as to whether a party justifiably relied on a misrepresentation, "summary judgment on that issue is appropriate." *March v. Statman*, 1st Dist. Hamilton No. C-150337, 2016-Ohio-2846, ¶ 22.

{¶ 48} Buyers' claim that sellers had knowledge of construction defects affecting the complex, the likelihood of litigation relating to those construction defects and the potential for additional fees and assessments to remedy the defects and/or fund the litigation is based on information contained in the association meeting minutes. Buyers point to several references in the association meeting minutes from 2011 to 2014 that they contend show (1) there were construction defects affecting the building as a whole (as opposed to issues in only certain units), (2) there was a dispute with the builder regarding liability for those defects and (3) that the cost to repair those defects and resolve the issues with the builder would be passed on to all unit owners. Buyers assert that because sellers attended certain

association meetings and received copies of the association meeting minutes during the time they owned the property, it can be reasonably inferred that sellers had knowledge of the matters set forth in the meeting minutes. Buyers further contend that due to sellers' "superior knowledge" regarding these issues, sellers had an obligation "to put buyers 'on equal footing'" by disclosing this information to buyers prior to the sale. The cases buyers cite in support of this proposition are, however, readily distinguishable from this case.

{¶ 49} In *Brewer v. Brothers*, 82 Ohio App.3d 148, 611 N.E.2d 492 (12th Dist.1992), the seller, who had performed the electrical work on the house, told the buyer he had "nothing to worry about" after the buyer asked the seller about the quality of the electrical system. *Id.* at 150. Although the purchase agreement stated that the property was being sold "as is," the buyer had a right to perform an inspection of the electrical system, but did not do so, claiming that he had relied on the seller's representation in deciding not to have an electrical inspection. *Id.* After the sale, the buyer discovered extensive problems with the electrical work and sued the seller. *Id.* The Twelfth District held that neither the "as is" clause nor the buyer's failure to conduct an inspection precluded the buyer's claim for fraudulent misrepresentation, noting that a "buyer's duty to inspect * * * terminates when representations are made with respect to a material fact in response to a buyer's direct inquiry." *Id.* at 152-154.

{¶ 50} In *Brownstone Developers II, L.L.C. v. Jivan Properties, L.L.C.*, 5th Dist. Stark No. 207-CA-00160, 2008-Ohio-883, the buyer initially looked at the

property at issue and, after an inspection, told the seller he had no interest in purchasing the property due to concerns regarding hazardous materials cleanup. *Id.* at ¶ 5-6. Based on his own concerns regarding environmental issues, the seller transferred the property to an L.L.C. *Id.* at ¶ 7. After the transfer, the seller reached out to the buyer to see if he was interested in purchasing the property. *Id.* at ¶ 8. The buyer advised the seller that he was not interested in purchasing the property unless all of the environmental issues had been resolved. *Id.* In response to the buyer's concerns about the environmental issues, the seller produced a remediation letter from the U.S. EPA stating that the remediation of the property had been completed. *Id.* Unbeknownst to the buyer, however, the seller had also received a separate notice of violations from the Ohio EPA, indicating that additional remediation work would be required, which the seller did not disclose to the buyer. *Id.* at ¶ 9. The seller thereafter received two additional notices of violation from the Ohio EPA, which he did not disclose. *Id.* at ¶ 10. The purchase agreement contained an "as is" clause. *Id.* at ¶ 11. The buyer inspected the property again and saw that the materials that had led to his initial concerns regarding hazardous materials had been addressed. *Id.* at ¶ 5, 11. At the closing, the seller executed an affidavit stating that he had no knowledge of any pending or threatened legal or administrative action relating to the property. *Id.* at ¶ 12.

{¶ 51} The Fifth District held that there were sufficient factual findings to conclude that the seller had fraudulently induced the buyer to purchase the property and that the buyer had reasonably relied on the seller's representation that all

environmental issues had been resolved. *Id.* at ¶ 26-27. The court further held that the "as is" clause did not preclude the buyer's fraud claim because the seller (1) had engaged in "active misrepresentation" by affirmatively stating, when questioned by the buyer, that the environmental problems had been fully resolved or (2) had "fraudulently concealed" information about the Ohio EPA from the buyer, knowing that the buyer's "overriding and ongoing question regarding the buying of the property was that all environmental issues had been resolved." *Id.* at ¶ 28.

{¶ 52} In *Mar Jul, L.L.C.*, 4th Dist. Washington No. 12CA6, 2013-Ohio-479, the Fourth District held that the trial court had erred in granting summary judgment for the seller on the buyer's fraud claim relating to the seller's misrepresentation of rental income and the duration of assigned leases in connection with the "as is" purchase of a commercial property. *Id.* at ¶ 68. In that case, the buyer did not review the written leases to verify the lease terms prior to the sale. *Id.* at ¶ 54, 64. However, it was undisputed that even if he had attempted to do so, the written leases would not have revealed the "true rent" the tenants paid due to oral agreements that modified the written lease terms and would not have reflected whether tenants had, in fact, agreed to renew their leases as represented by the seller. *Id.* at ¶ 64-67. It was also noted that the seller had instructed the buyer not to speak with tenants prior to the sale. *Id.* at ¶ 64. The court held that there was a genuine issue of material fact as to whether the buyer justifiably relied on the seller's misrepresentations because the buyer's reliance was "not patently unreasonable" and it could not be said

"as a matter of law" that the buyer "possessed an equal opportunity to obtain the lease information." *Id.* at ¶ 64-68. The court explained:

> "'Where the means of obtaining the information in question were not equal, the representations of the person believed to possess superior information may be relied upon.'" *Andrew v. Power Marketing Direct, Inc.*, 10th Dist. [Franklin] No. 11AP-603, 2012-Ohio-4371, 978 N.E.2d 974, ¶ 62 quoting *Fort Washington Resources, Inc. v. Tannen*, 858 F.Supp. 455, 460 (E.D.Pa.1994). Conversely, "[a]n individual has no right to rely on a representation when the actual facts are equally open to both parties." *Takis L.L.C. v. C.D. Morelock Props., Inc.*, 180 Ohio App.3d 243, 905 N.E.2d 204, 2008 Ohio 6676, at ¶ 30 (10th Dist.).

*Id.* at ¶ 63.

{¶ 53} This case is unlike the cases relied upon by buyers. This is not a case where the buyers made a direct inquiry of the sellers and the sellers responded by providing affirmative misrepresentations regarding specific conditions relating to the property. This not a case where the sellers actively concealed information known to be a deciding factor in the buyers' purchase decision or actively concealed a source of that information from the buyers. And this is not a case of "superior knowledge" or "unequal opportunity."

{¶ 54} To the extent there was material information in the association meeting minutes relevant to buyers' decision to purchase the property, buyers were on an "equal footing" with sellers with respect to that information, i.e., the source of the knowledge was the same for buyers and sellers and both buyers and sellers had access to the information prior to the sale. Indeed, in this case, buyers not only had the right and opportunity — but a contractual obligation — to "inspect" and "make diligent inquiry about all aspects of the Property, its condition and systems, the

condominium development, and its management and operations," including the meeting minutes, prior to the sale.

{¶ 55} Arnson testified if she had reviewed the meeting minutes at issue prior to purchasing the unit, she would have "questioned" and been "concerned" about purchasing the property based on what she had read in the meeting minutes. Morgan went a step further. He testified that if he had been aware of the information in the meeting minutes, he would not have purchased the property. Buyers, however, chose not to look at the meeting minutes until 2017, when preparing to file suit against sellers.

{¶ 56} Based on the record before us, it cannot be said that buyers justifiably relied on any alleged misrepresentations, nondisclosure or concealment by sellers with respect to the matters at issue. *See, e.g., Kovacic*, 1996 Ohio App. LEXIS 3474, at 19 ("A plaintiff cannot allege an action for fraud where the true facts are equally open to both parties."); *cf. Bender v. Logan,* 2016-Ohio-5317, 76 N.E.3d 336, ¶ 56 (4th Dist.) ("[C]ourts have understandably been unwilling to find justifiable reliance when a party failed to read a document before signing it. "'A person of ordinary mind cannot be heard to say that he was misled into signing a paper which was different from what he intended, when he could have known the truth by merely looking when he signed.'"), quoting *ABM Farms v. Woods*, 81 Ohio St.3d 498, 503, 692 N.E.2d 574 (1998), quoting *McAdams v. McAdams*, 80 Ohio St. 232, 240-241, 88 N.E. 542 (1909). Accordingly, the trial court properly granted sellers' motion for

summary judgment on buyers' fraud claims.  Buyers' first assignment of error is overruled.

**Other Rulings on Summary Judgment**

{¶ 57} Because we find that the trial court properly granted sellers' motion for summary judgment on buyers' fraud claims, we overrule buyers' second assignment of error, i.e., that the trial court erred in denying buyers' motion for summary judgment as to liability on those same claims, and sellers' cross-assignment of error, i.e., that the trial court erred in granting Northeast's motion for summary judgment on sellers' claims for indemnification and contribution.

{¶ 58} Judgment affirmed.

It is ordered that appellees recover from appellants and that cross-appellees recover from cross-appellants the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

MARY J. BOYLE, P.J., and
ANITA LASTER MAYS, J., CONCUR